# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | |
|---|---|
| HERMAN MCKINNEY, )<br>)<br>    Petitioner, )<br>)<br>v. )<br>)<br>MICHAEL PARRIS, Warden, )<br>)<br>    Respondent. ) | No. 2:18-cv-02790-TLP-tmp |

## ORDER DISMISSING PETITION, DENYING CERTIFICATE OF APPEALABILITY, CERTIFYING THAT ANY APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Herman McKinney[1] petitions pro se under 28 U.S.C. § 2254 for a writ of habeas corpus by a person in state custody.[2]  (ECF No. 1.)  Respondent has filed the state court record and answered the petition.  (ECF Nos. 18 & 21.)  Petitioner asserts many claims that focus on these issues: (1) whether the procedural default doctrine bars Petitioner's claims, (2) whether the state court correctly identified and applied the relevant federal legal principles, and (3) whether Petitioner's claims present a violation of federal law.  (ECF No. 1-1 at PageID 7–9.)

For the reasons below, the Court **DISMISSES** the petition and **DENIES** a certificate of appealability.  The Court also **CERTIFIES** that any appeal would not be taken in good faith and **DENIES** Petitioner leave to proceed in forma pauperis on appeal.

---

[1] Although the State indictments and court opinions spell Petitioner's last name "McKinley," Petitioner has spelled his last name as "McKinney" on his petition.  (ECF No. 1 at PageID 1.)
[2] Petitioner is an inmate at the North East Correctional Complex in Mountain City, Tennessee. (ECF No. 25.)  His Tennessee Department of Correction ("TDOC") prisoner number is 498581.

## I.      State Court Procedural History

In September 2011, following a trial in Shelby County Criminal Court, a jury convicted Petitioner of one count of second-degree murder, one count of attempted first-degree murder, two counts of aggravated assault, one count of employing a firearm during the commission of a felony offense, and one count of possession of a handgun as a felon.  (ECF No. 18-1 at PageID 90.)  The trial court sentenced Petitioner to a total effective sentence of one hundred thirty-one (131) years in prison.  (*Id.* at PageID 132–37.)  Petitioner appealed.  (ECF No. 18-1 at PageID 144.)  And the Tennessee Court of Criminal Appeals ("TCCA") affirmed the convictions and sentences.  (ECF No. 18-14; *see also State v. McKinley*, No. W2012-00050-CCA-R3-CD, 2013 WL 3193415 (Tenn. Crim. App. June 20, 2013), *perm. app. denied*, (Tenn. Nov. 13, 2013).)

In June 2014, Petitioner petitioned pro se for post-conviction relief in Shelby County Criminal Court under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101-122.  (ECF No. 18-18 at PageID 1462–76.)  The state court appointed counsel to represent Petitioner in those proceedings.  (*Id.* at PageID 1479.)  And Petitioner's appointed counsel twice amended the petition for post-conviction relief.  (*Id.* at PageID 1481–88, 1490–95.)  After conducting an evidentiary hearing, the post-conviction court denied relief in October 2016.  (*Id.* at PageID 1497–1525.)  Petitioner appealed.  (*Id.* at PageID 1527.)  And the TCCA affirmed. (ECF No. 18-22; *see also McKinley v. State*, No. W2016-02351-CCA-R3-PC, 2018 WL 799166 (Tenn. Crim. App. Feb. 8, 2018), *perm. app. denied*, (Tenn. June 8, 2018).)

## II.     Federal Court Procedural History

Petitioner then filed his pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 with this Court in November 2018.  (ECF No. 1.)  The Court directed Respondent to file the state

court record and respond to the petition.  (ECF No. 9.)  Respondent filed the state court record in

May 2019 and answered the petition a month later.  (ECF Nos. 18 & 21.)

Petitioner asserts these claims in his petition:

1. Trial counsel provided ineffective assistance[3] by:

   a. failing to meaningfully communicate with Petitioner about the facts of the case, failing to properly investigate the facts of the case, failing to interview all witnesses, and failing to adequately communicate with Petitioner about potential trial proceedings and Petitioner's theory of self-defense,

   b. failing to prepare for pre-trial suppression matters,

   c. failing to seek clarification of the jury instructions

   d. failing to seek recusal of the trial judge, and

   e. failing to preserve Petitioner's right to allocute at sentencing.

2. Petitioner's appellate counsel provided ineffective assistance.

3. The prosecution withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

4. Petitioner's sentence is excessive and violates the Eighth Amendment.

5. The evidence was insufficient to support Petitioner's convictions.

6. The cumulative effect of all errors denied Petitioner his right to a fair trial.

(ECF No. 1-1 at PageID 7–9.)

The TCCA reviewed issues 1d–e and 5 so they are exhausted.  But the procedural default

doctrine bars issues 1a–c, 2–4, and 6.

---

[3] To avoid repetition, the Court will combine and collectively address Petitioner's duplicative allegations of ineffective assistance of trial counsel.  The Court has sorted these allegations by category.

### III.   The Evidence

On direct appeal, the TCCA provided this summary of the evidence presented at

Petitioner's trial:

> The defendant's multiple convictions in this case arose from two separate, although related, shootings which occurred on September 23, 2009, at the Claiborne Holmes Apartments in Memphis.  Multiple witnesses testified about the two shootings, and certain discrepancies were noted in the various testimony.  However, the general testimony offered, with the exception of the defendant's, established that the defendant approached Laquita Turner and Jimmie Williams outside Ms. Turner's apartment and began an argument because his girlfriend refused to exit the apartment.  After leaving the scene, the defendant returned with a gun and fired one bullet between Ms. Turner and Mr. Williams, although neither party was wounded.  The defendant then left the area again, and police were called to the scene to investigate.  After the police left the scene, the defendant returned and was heard threatening Mr. Williams.  He approached the area where Mr. Williams was assisting a neighbor with his automobile and began firing the gun.  In the fray, seventeen-year-old Toby Gladney was shot and later died as a result of a gunshot wound to the back.

> At the defendant's trial, Laquita Turner testified that she lived with her mother in the Claiborne Holmes Apartments where the incident occurred.  She testified that she first saw the defendant on the evening of September 23, 2009, when he was peeking through her mother's apartment windows looking for his girlfriend, who was inside.  When Ms. Turner told him to stop, he told her to tell Tracy, his girlfriend, to come outside.  Tracy did not come out of the apartment, and the defendant left.  Shortly thereafter, Ms. Turner was on the porch talking with Mr. Williams when the defendant returned.  Ms. Turner told him that Tracy had gone, but the defendant accused Mr. Williams of "messing with" Tracy.  Mr. Williams explained to the defendant that he was there speaking with Ms. Turner, not Tracy.  The defendant walked away only to return five to ten minutes later.  This time the defendant was brandishing a gun, which he fired once at Ms. Turner and Mr. Williams.  Ms. Turner, who was four months pregnant at the time, testified that she saw fire and felt the heat as the bullet passed her.  According to Ms. Turner, she heard the bullet pass her and hit the brick wall behind her.  After firing the shot, the defendant again walked away.  Police were called to the scene.

> Ms. Turner testified that they never threatened the defendant and that neither she nor Mr. Williams were armed.  Officer Timothy Williams responded to the scene and spoke with both Ms. Turner and Mr. Williams, who each identified the defendant as the shooter.  Officer Williams was on the scene approximately thirty minutes investigating.  He was unable to recover any shell casings.  Mr. Williams told Officer Williams that the defendant was employed at a nearby McDonald's, and the officer left the apartment complex to go there.  Shortly after

arriving at McDonald's, the officer received a second call regarding shots fired at the Claiborne Holmes Apartments and returned to the scene.

During the interim after Officer Williams left the apartments, Ms. Turner and her mother were sitting on their porch outside the apartment. They observed Mr. Williams across the walk where he appeared to be working on an automobile. Several other individuals were also in the area. The two women then observed the defendant reappear from the direction from which he had left previously. As the defendant came around the corner, they observed that he had a gun, which he cocked and raised, as he advanced to the area where Mr. Williams and others were located. Ms. Turner heard the defendant say, "Y'all want it with me? Y'all want it with me?" She testified that several shots were then fired by the defendant. She also related that she saw no other weapon besides the gun which the defendant was firing. Once the shooting began, Ms. Turner retreated inside the apartment for safety reasons.

Jimmy Williams also testified at trial and confirmed that he was at the apartment complex when these events occurred. He was not a resident of the apartment complex but was there visiting his aunt. He did confirm that he was speaking with Ms. Turner outside her apartment. However, he testified that he and the defendant approached the apartment at the time time [sic] and that Tracy was also outside. Mr. Williams testified that he did speak casually with Tracy. Mr. Williams indicated that the defendant asked him to whom he was talking. Later, the defendant approached him and told him that "if you're messing with my girlfriend, it's going to be a misunderstanding." After this, the defendant disappeared behind the apartment complex. According to Mr. Williams, the defendant was agitated and was muttering you "motherf* * * * *s are going to learn me." Mr. Williams stated that he did not chase or threaten the defendant in any way. Shortly thereafter, the defendant returned with a gun, threatened Ms. Turner's mom, then pointed at him and shot. Ms. Turner was beside him while this occurred. Mr. Williams stated that he was terrified and did not see where the bullet had gone. The defendant remained in the area saying he was going to kill somebody, but he finally disappeared when he was told that the police had been called.

Afterwards, Mr. Williams testified that he was scared and angry. While he was outside, Mr. Courtney Oliver asked Mr. Williams to help with his car. Mr. Williams agreed, and the cars were positioned, hood to hood, with both hood[s] raised. Thereafter, he saw the seventeen-year-old murder victim, Mr. Gladney, approaching the area and then heard shots fired. Mr. Williams testified that he did not actually see the defendant shoot but afterwards saw the defendant running from the scene. Afterwards, Mr. Williams observed Mr. Gladney, his nephew, lying on the ground with a gunshot wound. According to Mr. Williams, Mr. Gladney did not have a gun in his possession when he approached. Mr. Williams testified that after the shooting, someone did hand him a gun. He stated that he just dropped it in the parking lot. Mr. Williams testified that he never threatened the defendant or

pointed a gun at him.  He also stated that he never asked Mr. Gladney to bring a weapon to the area.

Courtney Oliver testified that he also lived in the apartment complex and was present on the day of the incident.  Mr. Oliver was outside installing an alternator on his vehicle when he saw the defendant and another individual standing by the drainage ditch.  Mr. Oliver indicated that they disappeared and then the defendant reappeared beside the building where the initial shooting occurred.  Mr. Oliver did not witness the defendant fire the gun, but he did hear the shot.  Mr. Oliver did see the defendant walking away and heard him say, "I'll kill you bitches."  Prior to the arrival of the police, Mr. Oliver also heard Mr. Williams making threats as well.  On cross-examination, Mr. Oliver said that Mr. Williams called Mr. Gladney and requested that he bring him a gun.

Later, Mr. Oliver asked Mr. Williams to jumpstart his vehicle, and Mr. Williams agreed.  Just as they were getting ready to disconnect the jumper cables, Mr. Oliver saw Mr. Gladney approach carrying a shotgun, which he gave to Mr. Williams.  Mr. Oliver did not know whether the gun was loaded, and he testified that he never saw the shotgun fired.  He also stated that neither Mr. Williams nor Mr. Gladney were making any threats toward the defendant at this time.  Thereafter, he saw the defendant come around the side of the building walking towards Mr. Williams.  The defendant fired five or six shots, one of which struck Mr. Gladney. The defendant then laughed and walked away.

Raymond Jones was also present at the time of the second shooting.  He saw the defendant approach and fire his gun, one bullet striking Mr. Gladney.  Mr. Jones said that he did not see either Mr. Williams or Mr. Gladney with a gun.  He also testified that he did not hear any threats made by Mr. Williams prior to the shooting.

Mr. Eugene Williams testified that he was hanging out with his friends that night and saw a group of people working on a vehicle in the parking lot.  He testified that he saw Mr. Gladney approach the group carrying a shotgun, which he was holding down by his side.  At that point, he heard gunfire but was not able to see the shooter from his vantage point.  He testified that he did not see anyone point the shotgun before the shots were fired and that he did not hear any threats.  After the shooting stopped, he did observe someone pick up the gun and point it in the direction from which the shots had been fired, but it was never fired.

Mr. Eugene Williams further testified that he had been at the apartment complex for several hours prior to this shooting, but he denied that he had heard a prior gunshot.  However, he did state that he heard someone talking to the police earlier and thought it had to do with an argument over a girl.  He did see a man, whom he did not know, in the parking lot after the police left who appeared to be angry, although he did not hear any specific threats.

Jameda Frazier testified that she was visiting her sister who lived in the complex when the shooting began.  She had just arrived in the parking lot and was attempting to get her two small children out of the car when she heard the shots.  She grabbed her children and ran into her sister's apartment.  According to her testimony at trial, she told police that she heard either Mr. Gladney or Mr. Williams state they were "fixing to kill him" prior to the shooting.  However, she acknowledged that in her statement to police, she had said this statement was made after the shots were fired by the defendant.

When police officers returned to the scene, they found the victim, still conscious, lying on the ground in front a vehicle suffering from a gunshot wound.  Officers tried to stop the bleeding, and an ambulance was called.  Mr. Gladney was transported to the hospital where he later died.  Officers began to investigate at the scene.  They discovered that a bullet had hit the car, which was parked near the victim, under the hood, which was open.  They also discovered that a second bullet had hit an apartment window and broken it.  No shell casings or weapons were found on the scene.  Some witnesses at the scene did indicate that they saw someone put a weapon in the trunk of Mr. Williams' car, and a search of the vehicle was conducted with Mr. Williams' consent.  No weapon was found.

Dr. Karen Chancellor, a Shelby County medical examiner, performed the autopsy on the victim, Mr. Gladney.  She concluded that the victim died as a result of a gunshot wound to the torso which had entered the body from the back.

The defendant testified in his own defense.  He stated that he was a resident of the apartment and came into contact with Mr. Williams, whom he did not know, earlier in the day.  According to the defendant, he ran into Tracy, whom he barely knew and who was not his girlfriend, when Mr. Williams approached her from behind and said "what the f* * * is going on."  The defendant said Tracy flinched and walked away.  Afterwards, Mr. Williams "got in his face" and said "that's my hoe."  Later, as he was going to the store, he saw Mr. Williams on his cell phone.  He also testified that he met Ms. Turner, but they did not speak.  According to the defendant, he then proceeded to the store and remained there for twenty to thirty minutes.  He denied the first altercation and shooting as described by the State's witnesses ever occurred.

The defendant testified that on his way back from the store, he met some friends who asked him what was going on, "what's up with the guy from Arkansas?"  According to his friends, Mr. Williams was "mouthing out" and threatening to harm the defendant.  Although the defendant was not sure he believed his friends, he nonetheless took the 9mm gun they offered and put it into his back pocket.  The defendant stated that once he returned to the apartments, he approached Mr. Williams and asked him, "what do you want to beef about?"  At that point, according to the defendant, Mr. Gladney pointed the shotgun at him, and the defendant drew his gun and fired.  He was adamant that he only fired his weapon because the shotgun was "leveled" at him.  The defendant fled the scene.

Based upon his actions on September 23, 2009, the defendant was indicted by a Shelby County grand jury for: (1) first degree premeditated murder of Mr. Gladney; (2) attempted first degree premeditated murder of Mr. Williams; (3) two counts of aggravated assault with a deadly weapon against Mr. Williams and Ms. Turner; (4) employing a firearm during the commission of a dangerous felony; and (5) unlawful possession of a handgun as a convicted felon. Following a jury trial, at which the above evidence was presented, the sequestered jury received the relevant jury instructions, including those on self-defense. After deliberations, the jury found the defendant guilty in Count 1 of the lesser offense of second degree murder. He was convicted as charged of the remaining five offenses. The State notified the defendant of its intent to seek enhanced sentences based upon his prior convictions and filed a motion for consecutive sentencing. A sentencing hearing was held, and the trial court imposed the following sentences: (1) forty years at 100% for second degree murder; (2) forty years at 35% for attempted first degree murder; (3) fifteen years at 45% for each of the two aggravated assault convictions; (4) fifteen years at 100% for employing a firearm during the commission of a dangerous felony; and 5) six years at 45% for possession of a handgun as a convicted felon. Based upon the imposition of consecutive sentencing, the defendant is serving an effective sentence of one hundred thirty-one years in the Department of Correction.

The defendant filed a motion for new trial in the case. Following a hearing, the trial court, by written order, denied the motion. The defendant has now timely appealed that denial.

*State v. McKinley*, 2013 WL 3193415, at *1–5.

On post-conviction appeal, the TCCA provided the following summary of Petitioner's claims of ineffective assistance of counsel, the evidence presented at the post-conviction hearing, and the post-conviction trial court's decision:

[T]he Petitioner filed a petition and an amended petition for post-conviction relief, alleging, in pertinent part, that his trial counsel was ineffective by failing to preserve the Petitioner's right to allocution at the sentencing hearing and by failing to ask the trial court to recuse itself because it had signed the Petitioner's arrest warrant.[4]

At the post-conviction hearing, trial counsel testified that he was appointed to represent the Petitioner in 2011, approximately one and one-half years prior to trial. Trial counsel recalled that the case originally was set in Division X, which had a "very, very long wait period for trials" but that the trial court in Division VII "was gracious enough to let us set it in [its] court to get a quick court date."

---

[4] We will limit our recitation of the facts to those pertinent to the Petitioner's issues.

8

Trial counsel explained that "'[a]llocution' is where, at the—like, for instance, at a sentencing hearing, a defendant can have his say about, I guess, when he should get a smaller sentence, or he could talk about the facts of the trial if he wants to, and it's not under oath." Trial counsel thought he advised the Petitioner of his right of allocution but acknowledged he "might have missed that." Trial counsel conceded that he did not investigate the circumstances of the Petitioner's prior convictions. Trial counsel recalled that the Petitioner testified at trial but that his testimony did not "get[ ] into his background or his educational background . . . [or] his work background."

Trial counsel acknowledged that he did not investigate which judge signed the Petitioner's arrest warrant and that he did not know the judge who presided over the Petitioner's trial was the judge who signed the arrest warrant. Trial counsel said that the Petitioner did not ask trial counsel to have the trial judge disqualified.

On cross-examination, trial counsel said that his "hard work" and the Petitioner's testimony were responsible for the Petitioner's being convicted of the lesser-included offense of second degree murder instead of the charged offense of first degree murder.

Trial counsel said that a presentence report was introduced at the sentencing hearing. Trial counsel stated that if the Petitioner had wanted to testify at the sentencing hearing, neither he nor the trial court would have prevented the Petitioner from doing so.

Trial counsel said that the Petitioner's trial originally was scheduled to be heard in Division X, in which trials took approximately one year to be heard. The defense requested the case be transferred, and the request was granted. Initially, the case was transferred to Division III, then it was transferred to Division VII, which "had a quicker trial docket than even III at the time."

On redirect examination, trial counsel said that he did not recall whether the trial court ever invited the Petitioner to speak at the sentencing hearing.

The Petitioner testified that neither trial counsel nor the trial court advised him of his right to allocution at the sentencing hearing. The Petitioner maintained that he learned about allocution only when he did research after his incarceration. The Petitioner said that if he had been allowed to allocute, he would have informed the trial court that he was working as a maintenance man at three privately owned McDonald's restaurants at the time of the sentencing hearing, that he had obtained a general equivalency diploma (GED), and that he was enrolled in a pre-engineering program at Southwest Community College. The Petitioner said that he "also worked numerous jobs, packing, all kind of stuff."

The Petitioner acknowledged that he had some juvenile adjudications and explained that he "grew up in the projects," that he "did a lot of things that I ain't supposed to," and that sometimes he "pled guilty to . . . charges just because I was with my friend." The Petitioner said that he had six or seven prior convictions that were used to enhance his sentences. The Petitioner said that during his sentencing hearing, trial counsel did not explain to the trial court that most of the prior convictions occurred while the Petitioner was incarcerated and that the trial court instead believed that the convictions were the result of his behavior while "on the street." Specifically, the Petitioner complained, "[T]he picture was painted as if from '95, '96, '97, '98, '99, where I was constantly getting out of jail, catching charges and coming back to jail, which wasn't true." The Petitioner said that during his allocution, he would have explained that the "bulk" of his prior convictions occurred while he was incarcerated for a robbery conviction. He explained that he was tried as an adult when he was sixteen years old and was not released until March 2001 when he was twenty-three years old. The Petitioner stated, "I was young, I was smaller . . . , and at that time in the '90s, the county jail was really, really hard." The Petitioner said that while he was incarcerated, he had to defend himself because at times "older guys, bigger guys tried to take advantage of [him]."

The Petitioner said that the judge who presided over his trial was the judge who signed his arrest warrant. He said that although he was able to get an earlier trial date after his case was transferred from Division X to Division VII, the transfer "violated [his] constitutional right for [the trial judge] to sign [his] arrest warrant and preside over [his] trial, and now [the judge is] doing my Post–Conviction Hearing."

The post-conviction court asked the Petitioner if he had filed any pro se motions while his case was in Division X, including a motion for speedy trial. The Petitioner acknowledged that he had filed a motion for speedy trial. Regarding allocution, the Petitioner said that he did not recall the trial court's asking, "'Do you have anything to say or any questions before these judgments are entered?'" The post-conviction court explained that he did not use the word allocution because the Petitioner might not have understood that term.

The Petitioner said that he committed the crimes while in jail "in the '90s" because no cameras were in the jail, no officers were in the pods, and inmates were being raped, robbed, and killed. The Petitioner said that he was "little" and had to defend himself from other inmates. The post-conviction court noted, "[Y]ou don't have to fight because everybody in jail doesn't get charged with aggravated assault, they don't get charged with arson, they don't plead guilty to setting fire to the jail." The Petitioner responded, "If I didn't fight, [Judge], I would have got my manhood took. I would have been raped." The post-conviction court explained that "it's the convictions that are used to enhance you, not the underlying stats of the conviction[.]" The post-conviction court also informed the Petitioner that his employment status, GED, and college courses were listed in the presentence report.

The post-conviction court stated that it had reviewed the "extensive" notes it took during the Petitioner's trial, the relevant portions of the trial transcript, the findings during trial, and the direct appeal opinion. The court stated that the case had been transferred from Division X, which "had thirty-five first degree murder cases set for trial," to Division VII, which had "maybe fifteen or sixteen cases set for trial," because the Petitioner had requested a speedy trial. The court said that it had "no independent recollection" of signing the Petitioner's arrest warrant and that it routinely signed a number of arrest warrants.

Regarding allocution, the post-conviction court said that it was not required to examine the facts underlying the Petitioner's prior convictions and that the Petitioner's proposed allocution would not have affected the sentences imposed. The post-conviction court said that although trial counsel did not remember advising the Petitioner about his right to allocution, trial counsel testified that he generally advised all of his clients of the right to allocution. The court also noted that it always asked defendants if they had "'anything to say before these judgments are entered.'" Therefore, the court found that the Petitioner "was given a chance to allocute."

The post-conviction court found that trial counsel "did a remarkable job" representing the Petitioner. The post-conviction court found that the Petitioner had failed to prove that trial counsel was ineffective and denied the petition. On appeal, the Petitioner challenges the post-conviction court's ruling.

*McKinley v. State*, 2018 WL 799166, at \*1–3. With this in mind, the Court will now turn to the

legal standards governing Petitioner's habeas petition.

## IV.    Legal Standards

Federal courts may issue habeas corpus relief to persons in state custody under 28 U.S.C.

§ 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

But a federal court has limited authority and may grant habeas relief to a state prisoner "only on

the ground that he is in custody in violation of the Constitution or laws or treaties of the United

States." 28 U.S.C. § 2254(a).

### A.    Exhaustion and Procedural Default

A federal court may not issue a writ of habeas corpus on behalf of a state prisoner unless,

with certain exceptions, the prisoner has exhausted available state remedies. *Cullen v.*

*Pinholster*, 563 U.S. 170, 181 (2011).  Under 28 U.S.C. § 2254(b) and (c), a petitioner seeking

federal habeas relief must first present the claims in his petition to the state courts.  *Id.*  The

petitioner must "fairly present"[5] each claim to all levels of state court review, including the

state's highest court on discretionary review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  That

said, a petitioner need not present to all levels of the state court if the state has explicitly

disavowed state supreme court review as an available state remedy.  *O'Sullivan v. Boerckel*, 526

U.S. 838, 847–48 (1999).

Tennessee has done that.  Indeed, Tennessee Supreme Court Rule 39 eliminated the need

to seek review in the Tennessee Supreme Court.  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir.

2003).  Under Rule 39, "once the Court of Criminal Appeals has denied a claim of error, 'the

litigant shall be deemed to have exhausted all available state remedies.'"  *Id.* (quoting Tenn. Sup.

Ct. R. 39); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

There is also a procedural default doctrine much like the exhaustion requirement.  *See*

*Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the

exhaustion rule and the procedural default doctrine).  If the state court decides a claim on an

independent and adequate state ground (such as a procedural rule prohibiting the state court from

reaching the merits of the constitutional claim), the procedural default doctrine ordinarily bars a

petitioner from seeking federal habeas review.  *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977);

*see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim

rejected by a state court if the decision of the state court rests on a state law ground that is

---

[5] To exhaust each claim, "[i]t is not enough that all the facts necessary to support the federal
claim were before the state courts, or that a somewhat similar state-law claim was made."
*Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  Nor is it
enough to make a general appeal to a broad constitutional guarantee.  *Gray v. Netherland*, 518
U.S. 152, 163 (1996).

independent of the federal question and adequate to support the judgment." (internal quotation marks and citation omitted)).[6] In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If the procedural default doctrine bars a claim at the state level, the petitioner must show cause to excuse his failure to present the claim. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). And he must show (1) actual prejudice stemming from the constitutional violation, or (2) that a failure to review the claim will lead to a fundamental miscarriage of justice. *Schlup*, 513 U.S. at 320–21. For the latter, the petitioner must establish that a constitutional error has probably led to the conviction of a person who is actually innocent of the crime. *Id.* at 321; *see also House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## B.    Merits Review

Under § 2254(d), where a state court has adjudicated a claim on the merits, a federal court should grant habeas relief only if the state's adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[6] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)); *see also Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Walker*, 562 U.S. at 316 (internal quotation marks and citations omitted).

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."  *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

When a petitioner seeks habeas relief related to a claim the state court has adjudicated on the merits, § 2254(d)(1) limits a federal habeas court's review to the record the state court used to adjudicate the claim on the merits.  *Cullen*, 563 U.S. at 181.  A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  A state court unreasonably applies federal law when it "identifies the correct governing legal principle from" the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 412–13.  So the state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue.  *Id.* at 409.  And the habeas court may not issue the writ just because, "in its independent judgment," it determines that the "state court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411) (internal quotation marks omitted).

There is little case law addressing how to determine whether, under § 2254(d)(2), a state court based its decision on "an unreasonable determination of the facts."  In *Wood v. Allen*, the Supreme Court noted that a state-court factual determination is not "unreasonable" only because

14

the federal habeas court would have reached a different conclusion.[7]   558 U.S. 90, 301 (2010).

In *Rice v. Collins*, the Court explained that "[r]easonable minds reviewing the record might

disagree" about the factual finding in question, "but on habeas review that does not suffice to

supersede the trial court's . . . determination."  546 U.S. 333, 341–42 (2006).

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not

insatiable" and has emphasized that, under § 2254(e)(1), the federal court presumes that the state

court's factual determination is correct absent clear and convincing evidence to the contrary.

*Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).  A federal court will not overturn a state

court adjudication on factual grounds unless objectively unreasonable given the evidence

presented during the state court proceeding.  *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619,

624 (6th Cir. 2011) (same).

### C.     Ineffective Assistance of Counsel

The standards from *Strickland v. Washington*, control a claim that ineffective assistance

of counsel has deprived a defendant of his Sixth Amendment right to counsel.  466 U.S. 668, 687

(1984).  To succeed on such a claim, a petitioner must show two elements: (1) that counsel's

performance was deficient, and (2) "that the deficient performance prejudiced the defense."  *Id.*

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied on as

having produced a just result."  *Id.* at 686.

---

[7] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence."  558 U.S. at 299.  The Court found it unnecessary to reach that issue and left it open "for another day."  *Id.* at 300–01, 304 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006) (recognizing that it is unsettled whether there are some factual disputes to which § 2254(e)(1) does not apply)).

Plus the Sixth Circuit noted recently that this standard is "even more difficult to meet in habeas cases, where the review that applies to *Strickland* claims is 'doubly deferential.'" *Tackett v. Trierweiler*, 956 F.3d 358, 373 (6th Cir. 2020) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (internal quotation marks and citation omitted).

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A court considering a claim of ineffective assistance applies a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To show prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[8] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. And "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) (stating that "*Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail, but "places the

---

[8] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel performed deficiently. *Strickland*, 466 U.S. at 697.

burden on the defendant, not the State, to show a reasonable probability that the result would have been different." (internal quotation marks omitted)).

A federal court's deference to a state-court decision under 28 U.S.C. § 2254(d) increases when reviewing an ineffective assistance claim. According to the Supreme Court in *Harrington*:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

562 U.S. at 105 (internal citations and quotation marks omitted).

A criminal defendant is entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). But counsel's failure to raise a nonfrivolous issue on appeal does not constitute per se ineffective assistance. The Supreme Court has held the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted). So courts evaluate claims of ineffective assistance of appellate counsel using the *Strickland* standards. *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief); *Murray*, 477 U.S. at 535–36 (applying *Strickland* to appellate counsel's failure to raise issue on appeal). This means that, to establish that appellate counsel was ineffective, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal - that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he

must show a reasonable probability that, but for his counsel's unreasonable failure
to file a merits brief, he would have prevailed on his appeal.

*Robbins*, 528 U.S. at 285 (citation omitted).[9]

For these reasons, it is hard to establish a deficient performance by appellate counsel for
raising one issue on appeal, rather than another. *See id.* "In such cases, the petitioner must
demonstrate that the issue not presented was clearly stronger than issues that counsel did
present." *Matthews v. Parker*, 651 F.3d 489, 523 (6th Cir. 2011), *rev'd on other grounds*, 567
U.S. 37 (2012). And the petitioner must also show that "there is a reasonable probability that
inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356
F.3d 688, 699 (6th Cir. 2004).

When the direct appeals ends, so does the right to counsel. In *Coleman v. Thompson*, the
Supreme Court found that "[t]here is no constitutional right to an attorney in state post-
conviction proceedings." 501 U.S. at 752 (internal citations omitted). As a result, "a petitioner
cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Id.* What is
more, attorney error cannot constitute "cause" for a procedural default "because the attorney is

---

[9] The Sixth Circuit has identified a nonexclusive list of factors to consider when assessing claims
of ineffective assistance of appellate counsel:

1. Were the omitted issues "significant and obvious?"
2. Was there arguably contrary authority on the omitted issues?
3. Were the omitted issues clearly stronger than those presented?
4. Were the omitted issues objected to at trial?
5. Were the trial court's rulings subject to deference on appeal?
6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7. What was the appellate counsel's level of experience and expertise?
8. Did the petitioner and appellate counsel meet and go over possible issues?
9. Is there evidence that counsel reviewed all the facts?
10. Were the omitted issues dealt with in other assignments of error?
11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted). So when the state has no constitutional obligation to ensure that a prisoner has competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.

There is, however, a narrow exception to the rule in *Coleman*. In *Martinez v. Ryan*, the Supreme Court considered an Arizona law that did not permit petitioners to raise ineffective assistance claims on direct appeal. 566 U.S. 1, 6 (2012). The Court held that, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 17. The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here," and "[i]t does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at 16.

> To excuse a procedural default under *Martinez*, a petitioner must show that
>
> (1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an  ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (internal quotations and citations omitted). And, in *Trevino*, the Supreme Court extended its *Martinez* holding to states which have a "state procedural framework, by reason of its design and operation, [that] makes it highly unlikely in a

typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ."  569 U.S. at 429.  Thus, *Trevino* modified the fourth *Martinez* requirement for overcoming a procedural default.  What is more, the Sixth Circuit has found that both *Martinez* and *Trevino* apply to Tennessee prisoners.  *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

The Court now considers Petitioner's § 2254 claims.

## V.    Analysis of Petitioner's Claims

### A.    Issue One: Ineffective Assistance of Trial Counsel

Petitioner asserts that counsel appointed to represent him at trial in the state criminal proceedings provided ineffective assistance in many ways.  (ECF No. 1-1 at PageID 7.)  The Court will address each category of these allegations in turn.

#### i.    Issue 1(a): Investigating and Preparing Case for Trial

Petitioner contends that his trial counsel performed deficiently by failing to adequately communicate with Petitioner about the facts underlying the case and Petitioner's theory of self-defense, leading to a "lack of a coherent trial strategy."  (ECF No. 1-1 at PageID 7.)  Petitioner also claims that trial counsel "did not properly investigate the facts of this case" and "did not interview all witnesses who could have testified that Petitioner was acting in self-defense."  (*Id.*)  Respondent counters that because the Petitioner failed to raise Issue 1(a) in the post-conviction appeal, the procedural default doctrine bars the claims.  (ECF No. 21 at PageID 1801.)

True enough, Petitioner did not raise these issues in his post-conviction appeal.  As explained above, Petitioner filed a pro se petition in state court for post-conviction relief.  (ECF No. 18-18 at PageID 1462–76.)  And after the state court appointed counsel to represent Petitioner in those proceedings, Petitioner's post-conviction counsel amended the petition twice.

(*Id.* at PageID 1481–88, 1490–95.)  Petitioner's pro se petition for post-conviction relief raised

various contentions that trial counsel provided ineffective assistance by coercing Petitioner to

testify at trial, failing to call witnesses to establish self-defense, failing to investigate adequately

and failing to prepare the case for trial.  (*Id.* at PageID 1472–75.)  Petitioner's first amended

petition asserted that trial counsel failed to investigate properly the case and prepare it for trial.

(*Id.* at PageID 1484.)  The amendment also asserts that trial counsel coerced and pressured

Petitioner to testify at trial.  (*Id.* at PageID 1486.)  The final amendment asserts that trial counsel

performed deficiently by failing to preserve Petitioner's right to give an allocution during

sentencing and by failing to seek the trial judge's recusal.  (*Id.* at PageID 1490, 1492.)

On post-conviction appeal to the TCCA, Petitioner raised only the two claims asserted in

this final amendment.[10]  (ECF No. 18-20 at PageID 1693–98.)  Petitioner never raised with the

TCCA the claims of ineffective assistance of counsel in Issue 1(a) above, those related to trial

counsel's communications with Petitioner, investigation of the facts, and preparations for trial.

Because Petitioner did not raise these claims in his post-conviction appeal, he has not properly

exhausted them.  And given the state statute of limitations on state post-conviction relief,

Petitioner has no remaining avenue to present these claims in state court.  As a result, Petitioner

procedurally defaulted these claims.  And this procedural default operates as a complete and

independent procedural bar to federal habeas review of Issue 1(a).

Because the procedural default doctrine bars these claims because Petitioner failed to

preserve them on post-conviction appeal, even if he attributes this failure to error by his post-

conviction counsel, *Martinez* does not excuse the procedural default of these claims.  "[T]he

*Martinez-Trevino* exception does not extend to attorney error at post-conviction appellate

---

[10] This Court addresses those claims of ineffective assistance of counsel below.

proceedings because those proceedings are not the 'first occasion' at which an inmate could meaningfully raise an ineffective-assistance-of-trial-counsel claim." *Atkins v. Holloway*, 792 F.3d 654, 661 (6th Cir. 2015) (quoting *West v. Carpenter*, 790 F.3d 693, 698–99 (6th Cir. 2015)); *see also Martinez*, 566 U.S. at 15 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial.").

Of course, "defense lawyers need not (and in fact should not) raise every colorable argument they can find." *Moody v. United States*, 958 F.3d 485, 492 (6th Cir. 2020) (citing *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) ("Effective appellate counsel should not raise every nonfrivolous argument[.]"); *Wilson v. McMacken*, 786 F.2d 216, 219 n.3 (6th Cir. 1986) (trial counsel need not make "every colorable objection")).  "Tough judgment calls about what to challenge and what to let slide are part of lawyering.  Such decisions only become deficient— that is, incompetent—when no reasonable counsel would have made the same choice at the time." *Id.* (citing *Strickland*, 466 U.S. at 690).  Petitioner's post-conviction exercised discretion in selecting the arguments to present to the TCCA, limiting the brief to the strongest arguments. Counsel has no duty to raise baseless issues.  *See Davila*, 137 S. Ct. at 2067; *see also Moody*, 958 F.3d at 492 ("Of course, failing to raise wholly meritless claims is neither deficient nor prejudicial." (citations omitted)).  And Petitioner presents no evidence showing that this Court must review the claims in Issue 1(a) to prevent a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750; *see also Theriot v. Vashaw*, 982 F.3d 999, 1003 (6th Cir. 2020); *Richardson v. Palmer*, 941 F.3d 838, 847 (6th Cir. 2019).

At bottom, the procedural default doctrine bars the claims in Issue 1(a).  And for this reason, the Court **DENIES** Issue 1(a).

ii.     **Issue 1(b): Seeking to Suppress Evidence**

Petitioner contends that trial counsel performed deficiently by preparing no pretrial

suppression motions, hampering Petitioner's defense.  (ECF No. 1-1 at PageID 7.)  Respondent

counters that "it is unclear what more counsel might have done concerning pretrial suppression

issues," because Petitioner "does not explain whether his complaint is that trial [counsel] did not

file a suppression motion that should have been filed or if one were [sic] made but deficiently

prosecuted."  (ECF No. 21 at PageID 1807.)

Before trial, Petitioner filed a pro se motion to suppress the photographic identification.

(ECF No. 18-1 at PageID 63.)  The record fails to reflect that the motion was ever resolved.

Petitioner does not allege that he requested that his trial counsel pursue the motion before trial.

Petitioner failed to raise this claim on direct appeal, in his post-conviction petitions, or in the

post-conviction appeal.  (ECF No. 18-18 at PageID 1466, 1472–74, 1481, 1484–86.)  The

procedural default doctrine therefore bars this claim.

Under Sixth Circuit precedent, a Tennessee prisoner seeking federal habeas review can

"raise his post-conviction counsel's ineffectiveness as cause for the procedural default of his

ineffective-assistance-of-trial-counsel claims."  *Sutton*, 745 F.3d at 790.  But the claim still must

qualify as "substantial" under *Martinez*, meaning it must have "some merit" based on the

controlling standard for ineffective assistance of counsel.  566 U.S. at 14.

Petitioner has provided no factual basis in the habeas petition to support this claim.

Petitioner's conclusory allegation is not evidence and does not establish ineffective assistance of

counsel under *Martinez*.  Because Petitioner has not established a substantial claim of ineffective

assistance, the Court **DENIES** Issue 1(b).

### iii.    Issue 1(c): Seeking Clarification of Jury Instructions

Petitioner contends that his trial counsel performed deficiently "by failing to seek clarification of the jury instructions which would have allowed the jury to properly consider self-defense or provocation as an adequate alternative." (ECF No. 1-1 at PageID 8.) Respondent counters that the procedural default doctrine also bars this claim. (ECF No. 21 at PageID 1808.)

Petitioner fails to articulate what instruction needed clarification or which instruction was erroneous. The trial judge instructed the jury on self-defense. (ECF Nos. 18-6 at PageID 855–58; 18-11 at PageID 1274–76.) And on direct appeal, the TCCA determined that "[t]here is no question that the defendant's theory of self-defense was placed squarely before the jury and . . . they were instructed upon that theory by the court." *State v. McKinley*, 2013 WL 3193415, at *7. Petitioner cannot rely on a conclusory allegation to establish a substantial issue of ineffective assistance of trial counsel sufficient to excuse procedural default. The Court therefore **DENIES** Issue 1(c).

### iv.    Issue 1(d): Seeking Recusal of Trial Judge

Petitioner contends that his trial counsel performed deficiently by failing to seek the trial judge's recusal, because the trial judge also signed Petitioner's arrest warrant and "had extensive knowledge of [Petitioner's] prior run-ins with the law," which Petitioner claims prejudiced the trial judge. (ECF No. 1-1 at PageID 8.) Respondent counters that the TCCA's decision is not unreasonable under § 2254(d). (ECF No. 21 at PageID 1804.)

The TCCA considered this claim during Petitioner's post-conviction proceedings, and correctly identified *Strickland* as laying out the federal standard for its analysis. *McKinley v. State*, 2018 WL 799166, at *4. The TCCA had this to say about this issue:

> Finally, the Petitioner contends that trial counsel was ineffective by failing "to demand recusal of the trial court." The Petitioner maintains that because the

trial court signed his arrest warrant, it was constitutionally forbidden from presiding over his trial. In support of his contention, he cites *Hamilton v. State*, 403 S.W.2d 302 (Tenn. 1966). However, *Hamilton* is distinguishable from the Petitioner's case. In *Hamilton*, the general sessions judge who signed the defendant's arrest warrant was later elevated to the criminal court and presided over the defendant's trial. *Id.* at 302–03; *see also Huffman v. State*, 458 S.W.2d 29, 38 (Tenn. Crim. App. 1970) (explaining that the *Hamilton* court "dealt with a constitutional prohibition against a judge presiding over any matters that he had presided over in an inferior court"). Our supreme court found this to be a violation of article 6, section 11 of the Tennessee Constitution, which provides:

> "No Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested, or where either of the parties shall be connected with him by affinity or consanguinity, within such degrees as may be prescribed by law, or in which he may have been of counsel, or in which he may have presided in any inferior Court, except by consent of all the parties."

*Hamilton*, 403 S.W.2d at 303 (emphasis added).

> In the Petitioner's case, the trial court was acting within its purview as the criminal court when it signed the arrest warrant and was still acting within its purview as the criminal court when it presided over the Petitioner's trial. *See Sheddrick Harris v. Randy Lee, Warden*, No. E2016–01573–CCA–R3–HC, 2016 WL 7176984, at *3 (Tenn. Crim. App. at Knoxville, Dec. 9, 2016) (stating that a criminal court judge acts within his or her capacity when signing an arrest warrant or a search warrant and that "[n]othing prohibits a criminal court judge from issuing a search warrant relative to an individual's property and later presiding over the individual's criminal trial"). Therefore, no inferior court was involved; article 6, section 11 of the Tennessee Constitution was not implicated; and no constitutional provisions were violated. We conclude that the Appellant is not entitled to relief on this issue.

*McKinley v. State*, 2018 WL 799166, at *5.

Petitioner does not explain how the TCCA's decision violated *Strickland*. And Petitioner has not carried his burden of showing that the TCCA's decision was objectively unreasonable. Petitioner does not provide any argument or evidence that refutes the presumption of correctness given the state court's factual determinations. A state court's factual findings are entitled to a presumption of correctness unless there is clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1).

At the post-conviction hearing, trial counsel testified that Petitioner never mentioned seeking the trial judge's recusal.  Trial counsel testified, "there was never any . . . mention made of trying to have Judge Coffee disqualified.  Not to me."  (ECF No. 18-19 at PageID 1568.) Petitioner's lone complaint about the trial judge during his post-conviction hearing was that Judge Coffee signed Petitioner's arrest warrant and presided over his trial, which Petitioner claimed "violated [his] constitutional right."  (*Id.* at PageID 1609–10.)

Based on this Court's review of the trial transcripts and the post-conviction hearing transcript, the TCCA did not base its decision on an unreasonable determination of the facts. (ECF Nos. 18-2, 18-3, 18-4, 18-5, 18-6, 18-7, 18-8, 18-19.)  State law did not require the trial judge's recusal, and trial counsel had no meritorious basis for seeking recusal.  Deference to the state court's decision on this issue is appropriate.  The Court therefore **DENIES** Issue 1(d).

### v.   Issue 1(e): Right to Allocute at Sentencing

Petitioner also asserts that trial counsel performed deficiently by failing to preserve Petitioner's right to allocute at sentencing.  (ECF No. 1-1 at PageID 8.)  Petitioner contends that preserving his right to allocute at sentencing "may have served to reduce the sentence entered against him."  (*Id.*)  Respondent counters that the TCCA did not violate Supreme Court precedent or unreasonably apply *Strickland*.  (ECF No. 21 at PageID 1803–04.)

The TCCA reviewed this claim during Petitioner's post-conviction appeal.  The TCCA had this to say about this issue:

> The Petitioner first complains that trial counsel was ineffective by failing to "preserve [the Petitioner's] critical right to allocution."  This court has explained that allocution is "'[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence.  This statement is not subject to cross-examination.'"  *State v. Keathly*, 145 S.W.3d 123, 125 (Tenn. Crim. App. 2003) (quoting Black's Law Dictionary, 75 (7th ed. 1999)).  In his brief, the Petitioner contends:

> If the sentencing court had been able to consider a statement by [the Petitioner], free from the pressures of cross-examination, about [the Petitioner's] efforts to become a productive member of society, it is likely that the court would have considered this information in its structuring of the service of [the Petitioner's] sentences.

> The post-conviction court noted that the information regarding the Petitioner's efforts to become a productive member of society, such as his employment, GED, and enrollment in college courses, was included in the presentence report; accordingly, an allocution would have been cumulative. Moreover, the post-conviction court accredited trial counsel's testimony that he usually informed his clients of the right to make an allocution and thought he informed the Petitioner that he had the right to make a statement to the court. The post-conviction court also recalled asking if the Petitioner had anything to say to the court, which the court explained was equivalent to asking if the Petitioner wanted to make an allocution. The post-conviction court also noted that it had considered the Petitioner's prior convictions in sentencing, that it was not required to examine the facts underlying the Petitioner's prior convictions, and that any allocution regarding the prior convictions would not have made a difference. We agree with the post-conviction court that the Petitioner is not entitled to post-conviction relief in this regard.

*McKinley v. State*, 2018 WL 799166, at *4.

According to trial counsel's testimony at the post-conviction hearing, trial counsel could not recall whether he asked Petitioner about wanting to allocute at the sentencing hearing. (ECF No. 18-19 at PageID 1564, 1567.) But trial counsel testified that he "usually" and "normally" asked clients if they wanted to allocute at sentencing. (*Id.*) Trial counsel also testified that he would not have prevented Petitioner from testifying at the sentencing hearing. (*Id.* at PageID 1578.) And trial counsel stated that the State court judge would not have prevented Petitioner from testifying at the sentencing hearing either. (*Id.* at PageID 1580.)

Petitioner testified that neither trial counsel nor the trial court asked Petitioner whether he wanted to speak at the sentencing hearing. (*Id.* at PageID 1602–03.) Petitioner testified that if given a chance to speak, he would have told the jury about his work history, his education, and the facts of his prior assault convictions, which Petitioner said occurred when he was jailed at

27

age sixteen and other inmates tried to abuse him because of his small size.  (*Id.* at PageID 1603–06.)  The post-conviction court explained to Petitioner that the judge had to consider the prior convictions and that the law did not permit the judge to look at "the underlying facts of the conviction."  (*Id.* at PageID 1631.)  The post-conviction court also explained to Petitioner that Petitioner's work history and education were in the presentence report provided to the judge and that the judge considered them.  (*Id.* at PageID 1637–38.)

In sum, Petitioner contends that he wanted to testify to impermissible and cumulative information.  And Petitioner has shown no prejudice resulting from counsel's performance.  The Court finds that the TCCA did not violate or unreasonably apply *Strickland*.  Nor did the TCCA base its decision on an unreasonable determination of the facts given the evidence presented in the state court proceedings.  Deference to the state court decision on this issue is appropriate. The Court therefore **DENIES** Issue 1(e).

### B.    Issue Two: Ineffective Assistance of Appellate Counsel

Petitioner also asserts that his appellate counsel performed deficiently by failing to raise the issue that the cumulative effect of the errors at Petitioner's trial led to a fundamentally unfair trial.  (ECF No. 1-1 at PageID 8.)  Respondent counters that the procedural default doctrine bars this claim because Petitioner never raised it during his state court post-conviction proceedings. (ECF No. 21 at PageID 1808.)

True enough, Petitioner did not raise this issue in his pro se petition for post-conviction relief in state court.  (ECF No. 18-18 at PageID 1462–76.)  Nor did his counsel raise the issue in the later amendments.  (*Id.* at PageID 1481–88, 1490–95.)  What is more, Petitioner never raised this issue during his post-conviction hearing or presented this claim to the TCCA.  (ECF Nos. 18-19 & 18-20.)  The procedural default doctrine therefore bars this claim, and given the state

statute of limitations on state post-conviction relief, there is no remaining avenue for presenting this claim in state court.  This procedural default operates as a complete and independent procedural bar to federal habeas review of this issue.[11]   Because the procedural default doctrine bars this claim, the Court **DENIES** Issue Two.

###    C.    Issue Three: *Brady* Violation

Petitioner next asserts that the prosecution withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  (ECF No. 1-1 at PageID 8–9.)  According to Petitioner, "the prosecution violated his right to due process and a fair trial by violating the principles espoused in *Brady*" by "intentionally" failing "to turn over exculpatory evidence in the case which would have supported Petitioner's defense that he was acting in self-defense."  (*Id.*) Respondent counters that the procedural default doctrine bars this claim because Petitioner did not exhaust state court remedies on direct appeal or post-conviction review.  (ECF No. 21 at PageID 1808.)

A *Brady* claim has three elements: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued."  *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)); *see also Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006).  The *Brady* rule applies only "to evidence that was known to the prosecution, but unknown to the defense, at the time of trial, and the duty to disclose applies even if the defense made no request."  *Apanovitch*, 466 F.3d at 474.  And *Brady* "does not apply

---

[11] As Respondent points out, a habeas petitioner cannot rely on *Martinez* to excuse the procedural default of a claim for ineffective assistance of appellate counsel.  *See Davila v. Davis*, 137 S. Ct. 2058, 2062–63 (2017); *see also Hodges v. Colson*, 727 F.3d 516, 531 (6th Cir. 2013).

to information not wholly within the control of the prosecution." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *see also Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004). Finally, a *Brady* violation can excuse procedural default. *See Apanovitch*, 466 F.3d at 473–74.

Petitioner asserts here that "the State failed to turn over one or more statements made by the witnesses which were exculpatory in nature to Petitioner." (ECF No. 1-1 at PageID 9.) Petitioner identifies no witnesses and does not articulate the substance of any withheld statements. (*Id.*) Petitioner cites no evidence to support his claim. And habeas petitioners cannot rely on "mere speculation" to prove the elements of their claims. *Thomas v. United States*, 849 F.3d 669, 681 (6th Cir. 2017). Petitioner's conclusory allegation that the prosecution withheld exculpatory witness statements cannot maintain a *Brady* claim, let alone establish that a *Brady* violation occurred. And as Respondent points out, because Petitioner failed to raise this issue in state court, the procedural default doctrine bars this claim. The Court therefore **DENIES** Issue Three.

### D.   Issue Four: Eighth Amendment Violation

Petitioner claims that the trial court imposed an excessive sentence in violation of the Eighth Amendment's prohibition on cruel and unusual punishments. (ECF No. 1-1 at PageID 9.) According to Petitioner, his sentence is excessive "in the context of the facts that were in the possession of the litigants, including and by way of, consecutive sentencing and enhancements, and thus violates the dictates set forth in *Solem v. Helm*, 483 U.S. 277 (1983) and *Haremelian v. Michigan*, 501 U.S. 957 (1991)." (*Id.*) Respondent counters that the procedural default doctrine bars this claim because, on direct appeal, Petitioner "challenge[d] the trial court's consecutive sentencing decision . . . only on state-law grounds." (ECF No. 21 at PageID 1809.)

True enough, when presenting this issue to the TCCA on direct appeal, Petitioner cited Tennessee case law and Tennessee statutes.  (ECF No. 18-12 at PageID 1335–38.)  The TCCA considered the issue and opined:

> The defendant also contends that the trial court erred in ordering that his sentences be served consecutively.  A defendant may appeal from the length, range, or the manner of service of a sentence.  T.C.A. § 40–35–401(a).  We review a trial court's decision regarding the length of a sentence for an abuse of discretion, granting a presumption of reasonableness to within-range decisions that reflect a proper application of the purposes and principles of the Sentencing Act.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld."  *Id.* at 706.  The trial court in this case applied multiple enhancement factors and imposed the maximum sentences within the range for each of the defendant's convictions.  The defendant does not dispute the length of his sentences, and we agree the sentences were properly imposed; rather, he challenges only the trial court's imposition of consecutive sentencing.
>
> Under Tennessee Code Annotated section 40–35–115, a trial court may impose consecutive sentences if it finds it finds by a preponderance of the evidence that any one of the following is established:
>
>> (2) The defendant is an offender whose record of criminal activity is extensive;
>>
>> ... [or]
>>
>> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.
>
> T.C.A. § 40–35–115(b).  A single factor will support consecutive sentencing.  *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995); T.C.A. § 40–35–115.  For instance, a finding of an extensive criminal history alone justifies the imposition of consecutive sentences.  *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).  However, when imposing consecutive sentences solely on the basis that the defendant is a dangerous offender demonstrating little or no regard for human life and no hesitation in committing a crime in which the risk to human life is high, the trial court also must find that consecutive sentencing is "reasonably related to the severity of the offenses" and is necessary to protect society from further aggravated criminal conduct by the defendant.  *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (citing *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn.1995)).  Consecutive sentences must also comport with the general sentencing principles that the overall

sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40–35–103(2) & (4).

On appeal, the burden is on the defendant to show the impropriety of the sentence. T.C.A. § 40–35–401, Sentencing Comm'n Cmts; *State v. Goodwin*, 143 S.W.3d 771, 783 (Tenn. 2004). In the *Bise* case, a case which involved concurrent sentencing, our supreme court did not directly address whether the abuse of discretion with a presumption of reasonableness standard of review is to be applied to a court's decision to impose consecutive sentences. *See Bise*, 380 S.W.3d at 682. However, the court has cited with approval *State v. Henry Floyd Sanders,* No. M2001–00962–CCA–R3–CD, 2012 WL 4841545 (Tenn. Crim. App., Oct.9, 2012), *perm. app. granted,* (Tenn., Feb. 15, 2013), in which this court cited to the *Bise* language in stating the applicable standard of review on the issue of consecutive sentencing. *State v. Caudle*, 388 S.W.3d 273, 278–79 (Tenn. 2012). Moreover, the *Bise* court also stated that "when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the 'presumption of correctness' ceased to be relevant." *Bise*, 380 S.W.3d at 708. While other panels of this court have held otherwise, *See, e.g., State v. Ricky Earl Genes*, No. M2012–02284–CCA–R3–CD, 2013 WL 1395290, at \*6 (Tenn. Crim. App., Apr.8, 2013), we conclude that the imposition of consecutive sentencing should also be reviewed under the abuse of discretion standard with a presumption of reasonableness set forth in *Bise*.

In imposing consecutive sentencing in this case, the trial court made the following extensive findings of fact on the record:

> This Court does find that the defendant is an offender. His record of criminal activity is in fact extensive, not only as a juvenile. Not only is extensive but is violent. Not only crimes against property but against people. His record as an adult is extensive. He has been convicted in other states for which the defendant has been found guilty by this jury of being a convicted felon in possession of a handgun and the Court does find that his record of criminal activity is extensive. It is one of the most extensive, frankly, that this Court has seen as a juvenile. And anytime, the only time apparently that [the defendant] does not commit crimes is when he's locked up, but when [the defendant] is out of the streets of Shelby County or other states, [he] has continued to commit crimes against states across this country and his record is extensive.

> This Court also finds, as indicated earlier, that he is a dangerous offender whose behavior indicates little or no regard for human life. And has no hesitation about committing a crime in which the risk to human life is high. . . . This defendant . . . has a history of committing robberies, violent crimes against people,

crimes against property. Has a history of committing aggravated
assault offenses and been convicted three times or been a convicted
felon in possession of a handgun with a violent history. And this
Court does find, given the history and given the facts of this case,
when [the defendant] fired a gun between two people, and the
testimony from Mr. Williams and Ms. Turner indicated that they
were out on the sidewalk, outside of Ms. Turner's mother's home
just talking when the defendant walked up with a [gun], stood a few
feet from them and fired a gun at close proximity to them. They
both testified, particularly Ms. Turner, that she could feel the heat of
the bullet as it passed between them and she does not know how that
bullet missed them. This defendant left this location and came back
a few minutes later and continued to fire a semiautomatic weapon at
a group of people. Striking cars, striking apartments, killing a
seventeen year old kid when he tried to kill Jimmie Williams. And
this Court finds that he is a dangerous offender whose behavior
indicates little or no regard for human life and that he had no
hesitation about committing a crime in which the risk to human life
was in fact high. This Court also finds, pursuant to [*State v.
Wilkerson*, 905 S.W.2d 933 (Tenn. 1995)], . . . that the
circumstances surrounding the commission of this offenses are in
fact aggravated and that the (Indiscernible) reasonably relates to the
severity of the offenses for which the defendant stands convicted
and that consecutive sentences are necessary to protect the public
from future criminal acts of the defendant. . . . And this Court does
find under the *Robinson* case and under the *Wilkerson* case that
consecutive sentences are absolutely necessary in this case. [The
defendant] is thirty-three years old and for twenty plus years he had
been committing violent crimes against the State of Tennessee,
against Iowa. And had somebody at some point put [the defendant]
where he's been begging to go for a long period of time, he's been
begging judges to please put him in prison for a long period of time,
if somebody would have done that, Toby Gladney may not have
been killed. He might be alive had somebody taken [the defendant]
off the streets and put [him] in a position where he could not harm
anyone, but unfortunately, for thirty-three years, twenty some odd
years, at the age of thirty-three, [the defendant] has continued to
commit crimes and has continued to be allowed the privilege of
being in and out of prison until, unfortunately, a child was killed and
for all those reason, the Court is firmly of the opinion that
consecutive sentences are warranted in this case because of the facts,
because of his history and because of Tennessee law. . . .

Based upon our reading of its findings, we conclude that the trial court
found consecutive sentencing appropriate in this case based upon the fact that the
defendant: (1) had a record of criminal activity which was extensive; and (2) that

33

he was a dangerous offender. In his brief, the defendant contends that the court erred by finding him to be a dangerous offender because the court failed to articulate "any aggravating circumstances" which justify the imposition of consecutive sentences.

The defendant apparently makes no challenge to the court's finding that his record of criminal activity is extensive. As noted above, this finding alone supports the imposition of consecutive sentencing. *See Adams*, 973 S.W.2d at 231. Moreover, the record more than supports that the trial court did not abuse its discretion in reaching this conclusion. The court in great detail summarized the defendant's prior record which by any definition would be considered extensive. The crimes committed by the defendant included multiple driving offenses, being a felon in possession of a handgun, vandalism, thefts, robberies, and assaults. The court also specifically noted that the defendant was also charged and pled guilty to robbery as a sixteen-year-old in criminal court following a transfer based upon his already extensive juvenile record, with his first arrest occurring when he was twelve years old. We conclude there was no abuse of discretion in the trial court finding the defendant to be an offender who had an extensive criminal history.

Although unnecessary based upon our conclusion above, we nonetheless note that the trial court also did not abuse its discretion in determining that the defendant was a dangerous offender. Again, the defendant contends this finding was error because the trial court failed to specify "aggravating circumstances" which justified imposition of consecutive sentencing. He appears to argue that because the "dangerous offender" category is subjective and difficult to apply, it should only be applied based on the presence of "aggravating circumstances" surrounding the crimes for which the defendant is being sentenced. The defendant cites to *Gray v. State*, 538 S.W.2d 391, 393 (Tenn.1976), and *State v. Lambert*, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987), in support of this argument. However, the cases relied upon by the defendant were superseded by *State v. Wilkerson*, in which the supreme court considered the issue of consecutive sentences based on the "dangerous offender" classification in light of the Criminal Sentencing Reform Act of 1989 and held that "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed" without making any mention of the need for a finding that any additional aggravating circumstances accompanied the crimes. *Wilkerson*, 905 S.W.2d at 939. Thus, the trial court was not required to make such a finding in this case.

In this case, the trial court expressly stated that it found that both *Wilkerson* factors were satisfied in this case. The court considered the principles of sentencing and the circumstances of the crimes in reaching its conclusions, which were adequately articulated on the record. The facts of this case amply support the

findings made by the trial court. The defendant approached two unarmed people and initiated a dispute based upon his girlfriend's conduct, which eventually led to the defendant retrieving a weapon and firing directly between Ms. Turner and Mr. Williams. The defendant returned to the apartment complex and began randomly shooting in an area which was heavily populated with people, including two small children. His actions resulted in the death of a seventeen-year-old young man. The court could not reach any conclusion other than that the defendant had no meaningful respect for, and no hesitation about committing a crime that risks human life. The defendant's claim that the trial court erred by ordering him to serve his sentences consecutively is denied.

*State v. McKinley*, 2013 WL 3193415, at *8–11.

As the TCCA's analysis above makes clear, the state court addressed this issue as a matter of state law, not as a violation of Petitioner's federal constitutional rights. Federal habeas courts are "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Wilson v. Sheldon*, 874 F.3d 470, 477 (6th Cir. 2017) (quoting *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)). And "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Sanborn v. Parker*, 629 F.3d 554, 575 (6th Cir. 2010) (quoting *Estelle*, 502 U.S. at 67–68). And so federal habeas courts generally cannot revisit issues of state law. *See Dufresne v. Palmer*, 876 F.3d 248, 258 (6th Cir. 2017); *see also Keahey v. Marquis*, 978 F.3d 474, 478 (6th Cir. 2020) ("[F]ederal habeas applies only to convictions that offend 'the Constitution, laws, or treaties of the United States.'" (quoting *Estelle*, 502 U.S. at 68)). Put another way, claims based on state law violations are not cognizable in the federal habeas context. *See Moore v. Mitchell*, 708 F.3d 760, 791 (6th Cir. 2013); *see also Sanborn*, 629 F.3d at 575 ("[E]rrors in application of state law . . . are usually not cognizable in federal habeas corpus." (quoting *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983))); *see also Wilson v. Parker*, 515 F.3d 682, 705 (6th Cir. 2008) ("A federal court cannot issue a writ of habeas corpus 'on the basis of a perceived error of state law.'" (quoting *Pulley v. Harris*, 465 U.S. 37, 41 (1984))).

If Petitioner seeks habeas relief related to the state courts' application of Tennessee case law and Tennessee statutes, he cannot bring those claims in the federal habeas context. What is more, Petitioner did not exhaust his federal constitutional claims related to his sentence in state court. As explained above, Petitioner challenged his sentence before the TCCA, but he did not assert that his sentence violated the Eighth Amendment. Because no further avenue exists for exhausting the federal constitutional claims, the procedural default doctrine bars these claims. For these reasons, the Court **DENIES** Issue Four.

### E.    Issue Five: Sufficiency of Evidence

Petitioner claims that the prosecution presented insufficient evidence to support his conviction. (ECF No. 1-1 at PageID 9.) Petitioner contends that the State presented insufficient evidence "to convict [him] of offenses of specific, unexcused intent," and that "the lack of evidence amounted to a violation of [his] right of substantive due process." (*Id.*) Respondent counters that the TCCA applied the correct federal rule and reached the correct decision. (ECF No. 21 at PageID 1810.)

The TCCA reviewed the evidence presented at trial on direct appeal and considered Petitioner's argument. That court had this to say about it:

> "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[O]n appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Dorantes*, 331 S.W.3d at 379 (internal quotation omitted). It is the trier of fact who resolves all questions of witness credibility, the weight and value of the evidence, as well as all factual issues raised by the evidence. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Reviewing courts should neither re-weigh the evidence nor substitute their own inferences for those drawn by the jury. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

The trial court's approval of the jury's verdict accredits the State's witnesses and resolves all conflicts in the evidence in the State's favor. *State v. Moats*, 906 S.W.2d 431, 433–34 (Tenn. 1995). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules apply whether the verdict is predicated upon direct evidence, circumstantial evidence, or a combination of both. *Dorantes*, 331 S.W.3d at 379.

Again, the defendant in this case was convicted of second degree murder, attempted first degree murder, two counts of aggravated assault, employing a firearm during the commission of a dangerous felony, and being a felon in possession of a handgun. Second degree murder is the unlawful killing of another. T.C.A. § 39–13–201, –210(a)(1) (2010). Our statute defines "knowing" as follows:

> "Knowing refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."

T.C.A. § 39–11–302(b). First degree murder is a premeditated and intentional killing of another. T.C.A. § 39–13–202(a)(1). A person engages in the criminal attempt to commit a crime when he commits any of the following:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39–12–101(a). As relevant here, a person commits an aggravated assault by causing bodily injury, or creating the reasonable fear of impending bodily injury, with the use of a deadly weapon. T.C.A. § 39–13–102. Further, a person who employs a deadly weapon in the course of an attempt to commit first degree murder commits a Class C felony. T.C.A. § 39–17–1324(i)(1)(a).

The defendant's argument regarding the sufficiency of the evidence supporting his convictions for second degree murder and attempted first degree murder are based upon his claim of self-defense. While acknowledging that the issue of self-defense is a matter for the jury to decide, *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1991), the defendant contends that, despite the guilty verdict in this case, the evidence presented established that he had a reasonable fear for his life when he shot Mr. Gladney. He contends that the established facts are: (1) that a verbal confrontation with Mr. Williams has occurred; (2) that the defendant was warned by his friends that Mr. Williams was making threatening remarks; (3) that either Mr. Williams or Mr. Gladney was armed with a "short black shotgun" at the time of the shooting; and (4) that the shooting took place in the courtyard where the defendant lived. These facts he contends support a conclusion beyond a reasonable doubt that his theory of self-defense was established. Moreover, he asserts that "[e]ven in the absence of a legally sufficient self-defense claim the proof showed that [the defendant] is guilty of voluntary manslaughter because the evidence shows he was adequately provoked. *See* T.C.A. § 39–13–211(a). He contends that "[a]t most this incident was a confrontation between two men who were equally at fault."

With regard to the two aggravated assault convictions based upon the defendant's actions against Ms. Turner and Mr. Williams, he contends there is no proof in the record to establish this shooting occurred "[e]xcept for the incredible testimony" of the victims. He also relies upon the State's witness who testified he had been in the area and heard nothing, as well as the failure to procure any physical evidence from the scene such as a shell casing. Finally, with regard to his conviction for employing a firearm during the commission of a dangerous felony, the defendant urges that if this court concludes that his murder and attempted murder convictions should be reversed, this conviction must also be vacated because there is no underlying dangerous felony remaining to support this conviction.

The defendant's argument is essentially no more than a credibility challenge to the testimony and evidence which was presented to the jury. He does not complain that the state failed to prove any elements of the offenses with regard to second degree murder or attempted first degree murder; rather, he simply asks this court to reevaluate the jury's determination that self-defense was not established. There is no question that the defendant's theory of self-defense was placed squarely before the jury and that they were instructed upon that theory by the court. The defendant relies upon facts to support his argument which were introduced in large part by his own testimony of the events which occurred at the apartment complex. The jury heard that testimony and chose not to accredit the defendant's version of events. Contrary to the defendant's request, it is not the province of this court to reevaluate credibility determinations made by the trier of fact. *See Pappas*, 754 S.W.2d at 623. The jury heard the defendant's testimony that he fired in self-defense and, based upon their verdict, found it lacking in comparison to the testimony from numerous other individuals on the scene.

Likewise, the defendant's argument with regard to the two convictions for aggravated assault is based upon credibility. He asks that this court ignore the "incredible" testimony of the two victims, Ms. Turner and Mr. Williams, to determine that no evidence exists in the record to support that these crimes occurred. Again, that it not the function of this court. Both Ms. Turner and Mr. Williams testified at trial that the defendant pointed a gun between them and fired a shot, narrowly missing them. Ms. Turner's mother also provided testimony regarding the incident. That there is some discrepancy in the details of the events is not fatal to the case. Those discrepancies were heard by the jury and were pointed out by defense counsel on cross-examination. On appeal, it is the State who must be afforded the strongest legitimate view of the evidence. *See Dorantes*, 331 S.W.3d at 379.

Clearly, viewing the evidence in the light most favorable to the State, sufficient evidence was presented to allow a rational trier of fact to determine that the defendant committed the crimes for which he was convicted. The defendant approached Mr. Williams and Ms. Turner, and an argument ensued over the defendant's girlfriend who was inside the apartment. The defendant became agitated but left the apartment area but not before threatening remarks were made. He returned a short while later and fired a gun at Ms. Turner and Mr. Williams before again departing the area.

Shortly thereafter, the defendant was seen returning by multiple witnesses to the area carrying a gun. He approached a group of individuals with the gun pointed and fired multiple shots into the crowded parking lot, one of which killed Mr. Gladney. The defendant does not dispute that he in fact possessed the gun and that he shot Mr. Gladney. His only argument is one of self-defense. However, as noted above, the jury has concluded that the defendant's actions were not in fact justified. We conclude, as did the trial court, that the evidence is sufficient to support the convictions in this case.

*State v. McKinney*, 2013 WL 3193415, at *5–7.

When a petitioner raises a sufficiency of evidence claim, the federal habeas court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. Nagy*, 962 F.3d 192, 205 (6th Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Thompson v. Skipper*, 981 F.3d 476, 479 (6th Cir. 2020). In *Jackson*, the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been

satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324.

"This standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Smith*, 962 F.3d at 205 (quoting *Jackson*, 443 U.S. at 324 n.16); *see also Thompson*, 981 F.3d at 479 (same). And the federal habeas court "do[es] not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Smith*, 962 F.3d at 205 (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). And where the state court has adjudicated the claim on the merits, AEDPA mandates a second layer of deference. *Id.* "That is, even if [the court] were to conclude that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt, [the court] 'must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.'" *Id.* (quoting *Brown*, 567 F.3d at 205).

Petitioner here maintains that the evidence presented at trial did not establish "specific, unexcused intent." (ECF No. 1-1 at PageID 9.) In essence, Petitioner asks this Court to evaluate the evidence supporting his self-defense claim, a request the TCCA characterized as "no more than a credibility challenge to the testimony and evidence which was presented to the jury." *State v. McKinney*, 2013 WL 3193415, at *7. Respondent argues that Petitioner has no right to relief under the deferential standard applicable to insufficient evidence claims. (ECF No. 21 at PageID 1812.) Respondent points out that the TCCA correctly identified *Jackson* as setting the applicable standards and applied those standards in analyzing Petitioner's claim. (*Id.*) And Respondent asserts that the TCCA did not unreasonably apply *Jackson* or base its decision on an

unreasonable determination of the facts given the evidence presented in the state court proceedings. (*Id.* at PageID 1812–13.)

Indeed, on direct appeal, the TCCA correctly identified *Jackson* as setting forth the applicable standards for Petitioner's sufficiency of evidence claim. *See State v. McKinney*, 2013 WL 3193415, at *5. The TCCA then identified the elements of second-degree murder, attempted first-degree murder, aggravated assault, and employing a deadly weapon during an attempt to commit first-degree murder under Tennessee law. *Id.* After summarizing the evidence relevant to Petitioner's convictions, the TCCA emphasized that Petitioner "does not complain that the state failed to prove any elements of the offenses with regard to second degree murder or attempted first degree murder; rather, he simply asks this court to reevaluate the jury's determination that self-defense was not established." *Id.* at *5–7.

In sum, Petitioner wanted the TCCA to reevaluate the jury's determination that Petitioner did not act in self-defense. *Id.* at *7. And as stated above, Petitioner essentially asks this Court to do the same thing. But Petitioner faces a "demanding legal standard" in asserting this claim here. *United States v. Maya*, 966 F.3d 493, 498 (6th Cir. 2020) (quoting *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019)). And this Court's "limited review" precludes "intrud[ing] on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 499 (quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016)). Put another way, this "limited review" prevents the court "from reweighing the evidence or deciding . . . whether [the petitioner] or the government put on the more convincing case." *United States v. Miller*, 982 F.3d 412, 440 (6th Cir. 2020) (citing *Maya*, 966 F.3d at 499). The court "consider[s] only whether 'the government's case was

so lacking that it should not have even been submitted to the jury.'" *Id.* (quoting *Musacchio*, 577 U.S. at 243).

Respondent emphasizes that the trial record establishes Petitioner's "continuing, escalating conduct . . . that included threats, an initial shooting, and a second shooting that resulted in the killing of the victim," thereby providing "legally sufficient evidence of second-degree murder, a knowing killing." (ECF No. 21 at PageID 1813.)  Respondent also asserts that the State presented enough proof that Petitioner acted with intent and premeditation in shooting at his target victim, permitting a reasonable juror to conclude that Petitioner attempted to commit first-degree murder. (*Id.*)  Respondent also notes that the aggravated assault convictions "followed direct witness testimony about [Petitioner's] first shooting toward the two victims of those offenses." (*Id.*)

Based on this Court's review of the trial transcripts, the TCCA correctly concluded that the State presented enough evidence to support Petitioner's convictions.  The witness testimony and other evidence presented at trial provided ample basis for a rational trier of fact to find Petitioner guilty of second-degree murder, attempted first-degree murder, two counts of aggravated assault, and employing a deadly weapon during an attempt to commit first-degree murder.  What is more, the TCCA did not unreasonably apply *Jackson* or base its decision on an unreasonable determination of the facts given the evidence presented in the state court proceedings.  And because the TCCA's sufficiency determination is reasonable, this Court must defer to it.  *See Smith*, 962 F.3d at 205.  The Court therefore **DENIES** Issue Five.

### F.     Issue Six: Right to a Fair Trial

Lastly, Petitioner asserts that the cumulative effects of the errors at his trial led to a fundamentally unfair trial. (ECF No. 1-1 at PageID 9.)  Citing *Donnelly v. DeChristoforo*, 416

U.S. 637 (1974), Petitioner contends that the cumulative effect of the errors at trial and on appeal "denied him his constitutional right to a fair trial under the Federal Constitution." (*Id.*) Respondent counters that this claim is not cognizable in the federal habeas context. (ECF No. 21 at PageID 1813–14.) Respondent is correct.

Post-AEDPA, cumulative error claims are not cognizable. *See Hill v. Mitchell*, 842 F.3d 910, 948 (6th Cir. 2016) ("Under AEDPA, we do not recognize claims of cumulative error."); *see also Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). For this reason, the court **DENIES** Issue Six.

As explained above, the issues raised in this petition lack merit, are noncognizable, and are barred by procedural default. The Court therefore **DISMISSES** the petition **WITH PREJUDICE**. The Court will enter judgment for Respondent.

## VI.    Appellate Issues

A petitioner is not always entitled to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). In fact, the Court has to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). The court may issue a COA only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must reflect the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2)–(3). A petitioner makes a "substantial showing" when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the

issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must show that reasonable jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed even more).

Nor does the petitioner have to show that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same). But courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

Petitioner's claims here lack merit, are noncongnizable, and are barred by the procedural default doctrine. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

For the same reason, the Court also finds that any appeal would not be taken in good faith. The Court therefore **CERTIFIES** under Federal Rule of Appellate Procedure 24(a) that any appeal here would not be taken in good faith, and also **DENIES** leave to appeal in forma pauperis.[12]

**SO ORDERED**, this 21st day of March, 2022.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[12] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis and file a supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).